KLAMATH WATER USERS PROTECTIVE ASSOCIATION, Plaintiff–Appellant,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; Bureau of Indian Affairs, Defendants–Appellees.

No. 97–36208.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 3, 1999.

Decided Aug. 31, 1999.

Andrew M. Hitchings, DeCuir & Somach, Sacramento, California, for the plaintiff-appellant.

Matthew M. Collette, United States Department of Justice, Washington, D.C., for the defendants-appellees.

Before: KLEINFELD and HAWKINS, Circuit Judges, and SCHWARZER,* Senior District Judge.

Opinion by Judge SCHWARZER; Dissent by Judge MICHAEL DALY HAWKINS.

SCHWARZER, Senior District Judge:

The question before us is whether documents submitted by Indian Tribes at the request of the Department of the Interior in the course of consultation over ongoing administrative and adjudicative proceedings involving water rights and allocations affecting the Tribes' interests are exempt under the Freedom of Information Act as "inter-agency or intra-agency memorandums or letters. . . ." 5 U.S.C. § 552(b)(5) (1994).

## FACTUAL BACKGROUND

Klamath Water Users Protective Association (the "Association") brought this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, against the Department of the Interior (the "Department") and its constituent agency, the Bureau of Indian Affairs ("BIA"), see 25 U.S.C. § 1. The Association is a nonprofit association of water users in the Klamath River Basin who receive water from the Klamath Project (the "Project"), a federal reclamation project administered by the Bureau of Reclamation ("Reclamation"), an agency within the Department. See 43 U.S.C. § 1457 (1994). Members of the Association, most of which are public agencies, such as irrigation districts holding contracts with Reclamation, receive water from the Project, as do the Klamath Basin Tribes. Those Tribes include the Klamath Tribes, with fisheries located near Upper Klamath Lake, and the Yurok, Hoopa Valley, and Karuk Tribes, with fisheries on the Klamath River. The former Tribes have demanded that the Department maintain high lake levels to protect their fisheries, while the latter Tribes have demanded increased releases to the Klamath River to benefit their downstream fisheries. The Tribes' demands, if satisfied, would lead to reduced water allocations to members of the Association and have been protested by Association members who fear water shortages and economic injury in dry years.

In 1995, Reclamation announced its intention to prepare a plan for long-term operation of the Project, the Klamath Project Operation Plan ("KPOP"). The purpose was to enable the Project to operate in conformity with the Department's vari-

---

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

ous legal obligations in wet as well as dry years. The Department hired a consulting firm and held a series of meetings with interested parties. The meetings disclosed substantial disagreements among irrigation interests and the Tribes, leading the irrigation interests to fear that their water allocations would be cut. Although a draft KPOP was to be prepared for public comment in 1996, none has so far been released.

In connection with the development of the KPOP, the Department entered into an agreement with the Klamath Basin Tribes to provide consultation and cooperation to assist it in fulfilling its trust obligations. In a separate matter, the Department also filed claims on behalf of the Klamath Tribes in a water rights adjudication process established by the State of Oregon. This adjudication will quantify water rights, including those of the Klamath Tribes, in the Klamath River Basin.

The Association made several FOIA requests of the BIA for documents provided to or received from the Klamath Basin Tribes pertaining to water resources issues in the Klamath River Basin in order to discern what information was being exchanged during the preparation of the draft KPOP outside the public process. The Department released some documents, but withheld others. After the filing of this action, more were from time to time released and the Association withdrew its request for others. In the end only seven documents remained in dispute. They are listed in the *Vaughn* index submitted by the Department and are described as memoranda provided by the tribes to the Department for use in the development of the KPOP, a memorandum from the Department concerning the government's trust obligations in developing the KPOP, and memoranda from the tribes to the Department addressing claims in the water rights adjudication.

The district court granted the Department's motion for summary judgment. Insofar as relevant to our disposition, the district court held that the documents "qualif[ied] as inter-agency or intra-agency documents under the 'functional test,'" citing *Formaldehyde Inst. v. Department of Health and Human Servs.*, 889 F.2d 1118 (D.C.Cir.1989). It found that the documents "played a role in the agency's deliberations with regard to the current water rights adjudication and/or the anticipated Plan of Operations. Most of the documents were provided to the agency by the Tribes at the agency's request." The district court distinguished *Madison County v. Department of Justice*, 641 F.2d 1036 (1st Cir.1981), on the ground that "the Tribes are not in current litigation with the government, but instead acted in the role of consultants" and that "[t]he government used all these documents in fulfilling their trust obligation, and as part of their decision making process." The Association appeals from the judgment. We have jurisdiction of this appeal under 28 U.S.C. § 1291 and reverse.

## I. STANDARD OF REVIEW

 Ordinarily, review of summary judgment is de novo. In FOIA cases, however, because of their unique nature, we have adopted a two-step standard of review. We first determine whether the district court had an adequate factual basis upon which to base its decision. If so, we review the district court's conclusion of an exemption's applicability de novo. *See Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996). Some of our cases have applied the clearly erroneous standard to review of a district court's final determination of whether a particular document is exempt under the FOIA. *See, e.g., Rosenfeld v. United States Dep't of Justice*, 57 F.3d 803, 807 (9th Cir.1995); *Frazee v. United States Forest Serv.*, 97 F.3d 367, 370 (9th Cir.1996); *Maricopa Audubon Soc'y v. United States Forest Serv.*, 108 F.3d 1082, 1085 (9th Cir.1997). As we explained in *Schiffer v. FBI*, 78 F.3d 1405, 1409 (9th Cir.1996), application of that standard is appropriate in the common FOIA case where the district court's findings of fact effectively determine the legal conclusion.

We recognized, however, that where the adequacy of the factual basis is not disputed, the district court's legal conclusion whether the FOIA exempts a document from disclosure is reviewed de novo. *See id.* This appeal raises no factual issues. The question presented, whether the fiduciary and consultant relationship between the Department and the Tribes qualifies the disputed documents under the FOIA's threshold inter/intra agency test, is one of law. Accordingly, our review is de novo.

## II. APPLICATION OF THE FOIA

 The FOIA "does not apply to matters that are—

. . .

(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency . . . ."

§ 522(b)(5). We must apply this exemption consistently with our holdings that the FOIA " 'mandates a policy of broad disclosure of government documents.' " *Maricopa*, 108 F.3d at 1085 (quoting *Church of Scientology v. Department of the Army*, 611 F.2d 738, 741 (9th Cir.1980)). When a request is made, an agency may withhold a document only if it falls within one of the nine statutory exemptions in § 522(b) and these exemptions " 'must be narrowly construed' in light of the FOIA's 'dominant objective' of 'disclosure, not secrecy.' " *Id.* (quoting *Department of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976)). "FOIA imposes on agencies the burden of proving that withheld materials are exempt from disclosure." *Id.*

 The Department contends that the documents at issue, involving communications between the Tribes and the Department concerning the development of the KPOP and the Oregon water rights adjudication, meet the "functional test" of Exemption 5 for inter-agency/intra-agency communications. It rests its contention on the fact that to fulfill its fiduciary responsibility to protect and manage the natural resources of the Indian Tribes, it entered into a Memorandum of Agreement with the Tribes acknowledging their consultative role in these two matters.

The Department places principal reliance on *Formaldehyde Inst. v. Department of Health and Human Servs.*, 889 F.2d 1118 (D.C.Cir.1989). That case involved the application of Exemption 5 to a peer review letter received by the Centers for Disease Control ("CDC"), an agency within the Department of Health and Human Services, from a professional journal. The journal had reviewed a report submitted by an agency employee, determined not to publish the report, and then forwarded the peer review letter to the agency. The Formaldehyde Institute requested copies of all records of agency contacts with the journal relating to publication or rejection of the report. The agency rejected the request, relying principally on Exemption 5. The court of appeals reversed judgment for the Institute. Its opinion is largely devoted to determining that the peer review letter was predecisional and part of the deliberative process. But it also held that the peer review letter qualified under the inter-agency/intra-agency test. Quoting from its prior decision in *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1161–62 (D.C.Cir.1987), which, in turn, relied on *Ryan v. Department of Justice*, 617 F.2d 781 (D.C.Cir.1980), it held that " '[w]hether the author is a regular agency employee or a temporary consultant is irrelevant; the pertinent element is the role, if any, that the document plays in the process of agency deliberations.' " *See Formaldehyde*, 889 F.2d at 1118. In *Ryan*, the court had said that "[w]hen an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of determining the applicability of Exemption 5." *Ryan*, 617 F.2d at 790. More recently, the court held that communications mandated by statute between the National Archives and former

Presidents relating to access to their presidential records are within Exemption 5. *Public Citizen, Inc. v. Department of Justice,* 111 F.3d 168, 170–71 (D.C.Cir.1997).

This court has not yet had occasion to address the reach of the inter-agency/intra-agency test under Exemption 5 and to determine whether the expansive interpretation adopted by the District of Columbia Circuit is consistent with the policy of broad disclosure on which the FOIA is anchored. We need not reach the issue here because this case differs in a material respect from those on which the Department relies. Here, the Tribes with whom the Department has a consulting relationship have a direct interest in the subject matter of the consultations. The development of the KPOP and the Oregon water rights adjudication will affect water allocations to the Tribes as well as those to members of the Association. While the Tribes and the Association may not be engaged in conventional adversary litigation, they assert conflicting claims in a contentious proceeding involving the Department. The documents at issue are relevant to those claims. Thus, this case differs from *Public Citizen, Inc. v. Department of Justice,* on which the Department relies, in that it presents not simply "the potential for an adversary relationship" but a clear and present conflict with respect to the subject matter of the documents, which is for the Department to resolve. *See* 111 F.3d at 171 ("At some point, of course, features of the other relationships (above all, a possible future adversary one) might come to eclipse the consultative relationship . . . .").

We have held that documents submitted to an agency by persons outside the government as part of an administrative proceeding are not internal agency documents exempt from disclosure. *See Van Bourg, Allen, Weinberg & Roger v. NLRB,* 751 F.2d 982, 984–85 (9th Cir.1985) (affidavits describing union practices, officials and members submitted as part of an NLRB unfair labor practice investigation not within Exemption 5). The Department distinguishes the instant case on the

ground that it had *requested* the advice of the Tribes. But that distinction makes no difference because, as *County of Madison v. United States Dep't of Justice,* 641 F.2d 1036, 1040 (1st Cir.1981), holds in a similar context, consultation with the tribes is not similar to " 'the advice from staff assistants and exchange of ideas among agency personnel' that forms the object of exemption five," which exemption is limited to "interagency or intra-agency memorandums or letters." In *County of Madison,* the court held that communications between an Indian tribe and the Department of Justice in an unsuccessful effort to settle litigation between them did not qualify as inter-agency/intra-agency documents. It distinguished cases such as *Ryan* from the case before it in which, "by contrast, the Oneidas approached the government with their own interest in mind. While they came to parley, they were past and potential adversaries, not coopted colleagues." *Id.* While it is true that the Department requested the advice of the Tribes, the matters with respect to which it sought advice were matters in which the Tribes had their own interest and the communications presumptively served that interest, even if they incidentally benefited the Department. Thus, we conclude that even were we to take an expansive view of the inter-agency/intra-agency test, these documents do not qualify for exemption.

■ To hold otherwise would extend Exemption 5 to shield what amount to ex parte communications in contested proceedings between the Tribes and the Department. Rejection of such an extension does not conflict with the Department's fiduciary obligations to the Tribes. *See United States v. Cherokee Nation,* 480 U.S. 700, 707, 107 S.Ct. 1487, 94 L.Ed.2d 704 (1987). The Department exercises its regulatory powers in the context of the governing statutes; while it must act in the interests of the tribes, it may not afford them greater rights than they would have under the regulatory scheme. *See Skokomish Indian Tribe v. Federal Ener-*

*gy Regulatory Comm'n*, 121 F.3d 1303, 1308 (9th Cir.1997). Indeed, the 1994 Presidential Memorandum directing the heads of all executive departments and agencies to consult with tribal governments prior to taking actions that affect them specifically, provides that "[a]ll such consultations are to be open and candid so that all interested parties may evaluate for themselves the potential impact of relevant proposals." 3 C.F.R. 1007 (1995). And a corresponding directive issued by the Secretary of the Interior in 1993 contains the identical mandate. *See* United States Dept. of the Interior, Protection of Indian Trust Resource Procedures app. Order No. 3175 (1993).

Because the documents fail to meet the threshold inter-agency/intra-agency test, we need not reach the other issues raised by the Association. The judgment is REVERSED.

REVERSED.

MICHAEL DALY HAWKINS, Circuit Judge, dissenting:

The majority, in an effort which marginally advances the cause of open government, winds up punishing entities the government has a fiduciary duty to protect. For the reasons that follow, I would affirm the judgment of the district court that the documents at issue should remain protected from the prying eyes of outsiders to the trust relationship between Native American Tribes and the Department of Interior.

We are asked here to review the district court's findings that these particular documents, in their entirety, are exempted from disclosure under the Freedom of Information Act ("FOIA") by FOIA's exemption five. Although, in its own words, the Bureau of Indian Affairs ("Bureau") and other Interior Department Agencies have provided it with "numerous documents" pursuant to its FOIA request, the Klamath Water Users Protective Association ("Association"), a non-profit corporation whose membership consists mainly of irrigation districts, continues to seek the release of these seven documents. Six of the seven documents in question were exchanged between the Bureau and the Klamath Basin Indian Tribes [1] ("Klamath Basin Tribes" or "Tribes") in relation to consultation on the natural resource rights of the Klamath Basin Tribes in the Klamath River Basin in northern California and southern Oregon. The remaining document is a communication between the Department's Office of the Solicitor and a Tribe, in relation to an Oregon state proceeding in which the Department is mandated to press natural resources claims on behalf of affected Tribes.

The dispositive factor in this appeal, according to the majority, is that the Klamath Basin Tribes have a "direct interest" in the subject of their natural resource rights, and thus communications between the Tribes and the Interior Department can never fall within any reading of exemption five. In making the Tribes' "direct interest" the dispositive factor, however, I believe that the majority misreads and misapplies FOIA case law.

In deciding that these seven documents fail to meet the threshold "inter-agency/intra-agency" test for exemption from disclosure under exemption five, the majority never considers how the documents were employed in decision making. Fundamentally, the majority fails to recognize that the appropriate inquiry is an inquiry into the role a document plays in agency decision making, not into the identity of its producer. If this test were applied, I believe that the district court's conclusion

---

1. The Klamath Basin Tribes include the Klamath Tribes, the Yurok Tribe, the Hoopa Valley Tribe, and the Karuk Tribe. Their interests are not always in accord, as the Tribes located near Upper Klamath Lake would prefer high levels of water in the Lake, and those located on the Klamath River would prefer high levels in the River to protect their respective fisheries, but they are generally adverse to the interests of irrigation districts—some of whom are members of the Association—who would prefer the waters be devoted to irrigation.

that these documents are protected would be shown to be entirely correct.

Where the Bureau and Department are, by law, required to represent the interests of Indian Tribes, the majority's holding stands as a barrier to that representation. The majority implies that status as a federally recognized Indian Tribe, and the U.S. government's trust responsibilities to the Tribes, create not a cooperative, but an adversarial relationship between the government and the Tribe, and thus FOIA can be used to destroy any opportunity for "open and honest" consultation between them. I have great respect for the majority and its author, but I simply cannot agree with a notion I think so fundamentally wrong.

## FACTS

The Klamath Basin Tribes have natural resources rights tied to the waters of the Klamath River and Lake. *See, e.g., United States v. Adair,* 723 F.2d 1394 (9th Cir. 1984) (Klamath Tribes). In the past, the Klamath Basin Tribes have asserted these water rights to protect two species of fish in the Upper Klamath Lake, and to benefit tribal fisheries in the California stretches of the Klamath River.

The United States government and its agencies have a clear trust responsibility to protect Tribal natural resources. *See United States v. Cherokee Nation,* 480 U.S. 700, 707, 107 S.Ct. 1487, 94 L.Ed.2d 704 (1987). Pursuant to Presidential and Departmental directives, all agencies within the Interior Department are required to "consult with tribes on a government-to-government basis whenever plans or actions affect tribal trust resources." Department of the Interior, Departmental Manual: Part 512 American Indian and Alaska Native Programs, *Departmental Responsibilities for Indian Trust Resources* § 2.2 (1995). In spite of such consultation, the Tribes have not always

agreed with the Bureau of Reclamation, an agency of the Interior Department, in its decisions allocating Klamath waters and at one point threatened to sue under the Endangered Species Act to protect fish.

The Bureau of Reclamation administers the Klamath Irrigation Project ("Klamath Project"), which uses the waters of the Klamath to irrigate over 200,000 acres in Klamath County, Oregon and two northern California counties, mainly for agricultural purposes. The Association's interest in the Klamath's waters springs from its membership which is composed in the main of irrigation districts who have entered into contracts with the Bureau of Reclamation to deliver water from the Klamath Project.[2] While the Bureau of Reclamation has obligations under the Reclamation Act and contract to these irrigators, it owes them not the slightest fiduciary duty, or obligation to assert their claims. *See Nevada v. United States,* 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983) (finding obligations under Reclamation Act to project irrigators, but obligations to Indian Tribes grounded in trust responsibility); Filings of Claims for Water Rights in General Stream Adjudications, 97 Interior Dec. 21 (1989) (concluding that while United States is obligated to make filings in stream adjudications on behalf of project water rights to which it holds legal title, it is not required to make filings or present evidence on behalf of individual water users).

1. The Klamath Project Operation Plan

The triggering event for the Association's FOIA request was the 1995 announcement that the Department would be developing a long-term plan for operation of the Klamath Project, known as the "KPOP." Multiple agencies within the Department, including the Bureau of Reclamation, the Bureau of Indian Affairs, the

---

**2.** The Association is not itself a contractor with the Klamath Project for water. Most of its members, however, are irrigation districts and other public agencies who contract with the Klamath Project for water allocations.

The members then resell the water to private individuals and firms to irrigate commercial farming in Klamath County, Oregon and Modoc and Siskiyou Counties in California.

Biological Resources Division, the National Marine Fisheries Service, and the Office of the Solicitor have been jointly involved in the process. Public meetings were held to allow public participation in the planning process, and were attended by Interior Department personnel, Tribal representatives, environmental groups, members of the Association, and state agencies.

Besides the public meeting process, the Department has also separately consulted with the Klamath Tribes on the operation plan as part of its obligation to protect the Tribes' trust resources whenever a potential impact on resources might occur. The Association has no legitimate role in this consultation. Nor was the fact of it hidden from these parties: it was made visibly apparent on an information sheet distributed to publicize the planning process. The Department and Tribes entered into a "Memorandum of Agreement for the Government–to–Government Relationship in the Development of the Klamath Project Operations Plan" ("Memorandum of Agreement") which formalized the consultation commitment, and allowed participation by the tribal governments in "planning and managing the trust resource base."

The Department has not yet completed the KPOP. A draft plan was produced in 1996, but never released.

### 2. The Oregon Water Rights Adjudication

The Bureau also represents some of the Klamath Tribes in Oregon state proceedings to adjudicate all claims to surface water in the Klamath River Basin in Oregon. These proceedings were initiated by the Oregon Water Resources Department pursuant to Oregon law. As well as asserting its own claims, the United States has an obligation to assert the rights of the Tribes. *See United States v. White Mountain Apache Tribe,* 784 F.2d 917, 920 (9th Cir.1986). While these proceedings are not covered by the Memorandum of Agreement, the tribes have been extensively consulted in the process of determining the scope of the Tribes' water

rights claims, and legal theories that could be advanced on their behalf. Other federal agencies have also filed water rights claims, as have private parties.

### 3. The FOIA Request

In 1996, the Association submitted FOIA requests to the Bureau seeking communications exchanged between the Bureau and the Tribes during the time period the draft KPOP was being prepared and reviewed. Unhappy with the information released by the Bureau, the Association filed this action seeking further disclosure pursuant to FOIA. In the course of the litigation, the Bureau released more documents, and the Association dropped its requests for others, leaving only these seven documents at issue.

Based on its findings regarding the role the documents played in agency deliberations, as well as on the consultative relationship that trust responsibilities and the Memorandum of Agreement established with the Tribes, the court below concluded that these seven documents fall within the exemption from disclosure provided by exemption five.

Document 3, FOIA Appeal 96–168, is a fax from the Klamath Tribes to the Bureau that contains a position paper on the water rights of the tribes. An affidavit from a Bureau employee stated that the Department had requested the position paper for use in departmental deliberations about the adjudication, and trust responsibilities in developing the KPOP. The court below found that disclosure would "discourage candid discussions within the Department" and "undermine the Department's ability to address water rights issues concerning the tribes."

Document 6, FOIA Appeal 96–168, is the only document from the Bureau to the Klamath Basin Tribes. It is a draft memo prepared by a Bureau employee that was circulated to two other Bureau employees and two Tribal attorneys proposing draft language to explain the Bureau's responsibilities for trust assets in the KPOP pro-

cess. The court below found that the document was used pursuant to consultation with the tribes, relied upon in agency deliberations, and that disclosure would discourage inter-departmental discussion and harm the development of the operations plan.

Document 10, FOIA Appeal 96–168, is a fax from a Klamath tribal attorney to a Bureau employee expressing views on trust resources, especially fish. An affidavit by the Bureau employee receiving the fax established that he had requested the document and used it in his work preparing for the development of the KPOP. The court below again found that the document had been obtained pursuant to consultation with the tribes, relied upon by agency personnel in deliberations, and that disclosure would discourage inter-departmental discussion and harm the development of the operations plan.

Document 16, FOIA Appeal 96–201, is a letter from a Klamath tribal attorney expressing views on the tribe's water rights claim in the adjudication. An affidavit from a Department employee established that the Office of the Solicitor asked for the information and used it to prepare for the water rights adjudication. The court below again found that the document had been obtained pursuant to consultation with the tribes, been relied upon by Departmental personnel in deliberations, and that disclosure would discourage inter-departmental discussion.

Document 20, FOIA Appeal 96–201, is also a letter from the Klamath Tribes to the Bureau concerning water rights, used to prepare for the water rights adjudication. The court below again found that the document had been obtained pursuant to consultation with the tribes, relied upon by the Bureau in its deliberations, and that disclosure would discourage inter-departmental discussion and harm the development of the operations plan.

Document 25, FOIA Appeal 96–201, is a letter from a Klamath tribal attorney to the Bureau on water rights that also includes a tribal resolution. Affidavits by Bureau employees again establish that this document was requested by the Bureau to assist in preparing for the water rights adjudication. The court below made the same findings in relation to this document as to the others, and also found that disclosure would "expose sensitive litigation positions" of the Department in the adjudication.

Document 27, FOIA Appeal 96–201, is a memo from a Klamath Tribes biologist to a Bureau employee discussing biological factors that may affect trust resources such as fish. Affidavits again establish that the Bureau requested and used this document to develop the KPOP. The court below made the same findings in relation to this document as to the others, and also found that disclosure would "expose technical opinions deemed critical to analyzing the extent of the Department's trust responsibility."

## ANALYSIS

The Association argues that withholding these seven documents "unfairly and unduly disadvantage[s]" the Association and its members in their ability to participate in the KPOP process. The Department argues that the district court was correct in finding that the documents fall within FOIA exemption five as inter-agency or intra-agency communications, because the Tribes are in effect "consultants" to the Bureau on the issue of Tribal natural resource rights, and that releasing the documents would chill the agency's ability to make policy decisions.

The crucial question is the interpretation and applicability of exemption five to these documents, in these circumstances.[3] Exemption five exempts from public disclosure "inter-agency or intra-agency memo-

---

**3.** As the majority explains, while our standard of review of summary judgments under FOIA is unsettled, this threshold determination is subject to de novo review as a question of law.

randums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). While, like all FOIA exemptions, we narrowly construe exemption five, *see Van Bourg, Allen, Weinberg & Roger v. NLRB*, 751 F.2d 982 (9th Cir. 1985), we also recognize that it "incorporates the attorney-client privilege, the attorney work-product privilege, and the executive 'deliberative process' privilege that protects candid internal discussion of legal or policy matters." *Maricopa Audubon Soc'y v. United States Forest Serv.*, 108 F.3d 1082, 1083 n. 1 (9th Cir.1997).

In considering the applicability of the "deliberative process" privilege contained within exemption five—the privilege mainly at stake in this case—this court has usually found itself engaged in a two step process: (1) determining whether a document is "predecisional," and, if so; (2) determining whether it is "deliberative." *See, e.g., Maricopa Audubon Soc'y v. United States Forest Serv.*, 108 F.3d 1089, 1093 (9th Cir.1997); *Assembly v. United States Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir.1992); *National Wildlife Fed'n v. United States Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir.1988); *Federal Trade Comm'n v. Warner Communications Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984). In this instance, however, the majority's decision rests on a more basic challenge to the applicability of the exemption—a challenge to whether the documents in question are "inter-agency or intra-agency."

At first glance, the majority's decision that the documents—which no one disputes were exchanged between the Klamath Tribes and the Bureau—are not "inter-agency or intra-agency" documents seems entirely logical. The Klamath Tribes are not agencies of the federal government, and would probably strongly resist characterization as such.

Exemption five has not been so narrowly construed, however, by this court or by others. The purpose behind exemption five is the promotion of quality governmental decision making by allowing free and independent debate during the course of decision making, without exposure of intermediate opinions and recommendations to the "fishbowl" of public scrutiny. *See Environmental Protection Agency v. Mink*, 410 U.S. 73, 87, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). Since an agency will often rely on "opinions and recommendations of temporary consultants, as well as its own employees," *Ryan v. Department of Justice*, 617 F.2d 781 (D.C.Cir.1980), in its deliberative process, communications from these consultants, although not literally inter-agency or intra-agency can be "an integral part of [the agency's] deliberative process." *Id.* at 789–90. Thus, this circuit and others have recognized that documents created by outside consultants that otherwise qualify as deliberative, predecisional agency documents may also shelter within exemption five. *See Van Bourg*, 751 F.2d at 985 (stating that documents prepared by outsiders with formal relationships to agencies may fall within exemption five); *see also Public Citizen, Inc. v. Department of Justice*, 111 F.3d 168 (D.C.Cir.1997); *Formaldehyde Inst. v. Department of Health and Human Serv.*, 889 F.2d 1118 (D.C.Cir.1989); *Brockway v. Department of Air Force*, 518 F.2d 1184 (8th Cir.1975); *Wu v. National Endowment for Humanities*, 460 F.2d 1030 (5th Cir.1972).

In determining whether a document, or communication from an outside consultant is part of the "deliberative process" that exemption five is designed to protect, "the pertinent element is the role, if any, that the document plays in the process of agency deliberations." *CNA Financial Corp. v. Donovan*, 830 F.2d 1132, 1161 (D.C.Cir. 1987); *see also Formaldehyde Inst.*, 889 F.2d at 1123. The primary consideration is not the identity of the creator of the document, but "what harm, if any, the [document's] release would do to [the agency's] deliberative process." *Id.* This "functional test" covers circumstances "where an agency has 'a special need for the opinions and recommendations of temporary consultants,'" exempting docu-

ments with such information from disclosure under FOIA. *See State of Texas v. ICC,* 889 F.2d 59, 61 (5th Cir.1990) (quoting *Hoover v. United States Dep't of the Interior,* 611 F.2d 1132 (5th Cir.1980)).

The majority, however, holds that the seven documents here in issue can never fall within any reading of exemption five of FOIA, because the Klamath Basin Tribes have a "direct interest" in the water and natural resource rights to which the documents pertain. In my view, the majority errs in resting their decision on this "direct interest" and abandoning examination of the function of these documents within the Bureau's deliberative processes.

The majority believes the Tribes' "direct interest" in natural resource and water rights causes a conflict of interest that makes these documents function as tools of advocacy rather than consultancy. The majority is unclear, however, why this "direct interest" automatically disqualifies the documents for use in agency deliberations—whether the crux of the problem is conflict between the Tribes and the Association, or conflict between the Tribes and the Department. While the majority states at one point that the Tribes and the Association "assert conflicting claims in a contentious proceeding," they also state that these are "contested proceedings between the Tribes and the Department." [4]

Regardless of where the majority means to fix this "conflict," the function of these documents was to aid in departmental policy making, and the Tribes never exited their role of consultancy to become advocates. These documents are not advocacy, but the written record of an agency's consultation of a knowledgeable source, whose rights the agency is obligated to protect, in the process of making decisions as to how best to protect those rights.

If the majority believes that the Tribes' direct interest in natural resource and water rights is problematic because the Tribes and Association "assert conflicting claims in a contentious proceeding," the cases that the majority relies upon are inapposite. The existing case law, while relying on the role of the document in agency deliberations as the determinative factor, looks not at conflict between competing claimants before an agency, but at the existence of conflict between outside entities and an agency in trying to determine that role.

The "potential for an adversary relationship" raised in *Public Citizen,* 111 F.3d at 171, was not a potentially adversarial relationship between Public Citizen and the former President, but a potentially adversarial relationship between the former Presidents and the Records Agency that the court found remained consultative. *See id.* Nor did the *County of Madison* decision rest upon the adversarial relationship between the County and the Oneida, but upon the adversarial relationship—litigation—between the Department of Justice and the Oneida. *See County of Madison v. United States Dep't of Justice,* 641 F.2d 1036, 1040 (1st Cir.1981).

Moreover, this is not a case like *Van Bourg* where the agency is formally adjudicating a claim between two parties, and reviewing documents submitted by those private adverse parties to represent their positions in litigation, or a formal agency investigation. *See Van Bourg,* 751 F.2d at 985. Documents submitted in such circumstances would indeed have been submitted in response to "a mere request for information" by the agency to allow it to make a determination and could be viewed as advocacy, rather than being "a consulta-

---

4. If the majority means to characterize this case as the assertion by the Tribes and the Association of "conflicting claims in a contentious proceeding involving the Department" creating a "clear and present conflict with respect to the subject matter of the documents, which is for the Department to resolve," as a threshold matter, such a charac-terization fails to recognize or address that at least four of the seven documents were used by the Bureau and the Department to prepare to represent the Tribes' claims in the Oregon water rights adjudication—not a proceeding which either the Bureau, or the Interior Department, has the authority to "resolve."

tion or solicitation of expert advice ... sought for the purpose of formulation of [agency] policy." *State of Texas*, 889 F.2d at 61. These documents were, instead, submitted at the request of the Bureau in order to allow it to formulate a position on the Klamath Basin Tribes' claims in the KPOP and the Oregon adjudication.

The majority argues that the Tribes' direct interest in their subject matter makes unimportant that the Bureau requested these documents from the Tribes. With the analysis properly focused on the function of the documents, however, rather than on the identity of the consultant, the request shows that the Bureau and the Tribes were in a consultative, not adversarial relationship. Sharing proposed strategies, as several of the memos do, is not the action of parties in conflict.

If the majority means to argue instead that these are "contested proceedings between the Tribes and the Department," while this position would be in line with existing analysis of exemption five, the majority's analysis remains flawed. The Tribes and Bureau are not engaged in an adversarial relationship.

Rather than being distinguishable, *Public Citizen* is highly persuasive in establishing that exemption five does apply. *Public Citizen* directly rejects the majority's position that "a distinct and independent interest ... makes [an outside entity] an adversary [to the agency] rather than a consultant." *Public Citizen*, 111 F.3d at 171. Much as the Klamath Basin Tribes have natural resource rights which the Bureau and Department have a duty to reconcile with other parties' claims to water, the ex-President has "rights and privileges" in records that the Archivist has to reconcile with duties to the public to make records available. *See id.* The mandated consideration that the Bureau and Department have to give to the Klamath Basin Tribes' claims virtually requires that they consult the Tribes, much as the Archivist consulted the ex-President, to seek their peculiar expertise concerning their rights, and how they wish to assert them in the KPOP and Oregon adjudication.

The affidavits from Department and Bureau employees, accepted by the court below, confirm that these communications spring from a relationship that remains consultative rather than adversarial, a relationship in which the Bureau and Department were seeking the expertise of the Tribes, rather than opposing them. Like the court in *Public Citizen*, which relied on a similar declaration by an Archives employee explaining that the communications with the ex-President were used to streamline the reconciliation of interests and ensure rapid resolution, I believe that the "[t]he existence of independent ... interests provides no basis for doubting this explanation." *See id.* I would find that in these circumstances "the potential for an adversary relationship is not enough to negate one of consultation." *Id.* The communications between the Tribes and the Bureau are, as the affidavits explain, communications aimed at allowing Bureau employees to understand the Tribes' natural resource rights and formulate policy accordingly.

*County of Madison*, a fundamentally different case, does not stand as a barrier to the application of exemption five even under "an expansive view of the inter-agency/intra-agency test." There, the Oneida Tribe and the United States were engaged in adversarial litigation, and the documents the United States sought to withhold were documents related to litigation settlement negotiations. *See County of Madison*, 641 F.2d at 1036, 1041–43. In such a situation of direct adversity between an agency and an outside party, documents are outside of exemption five, especially where there is not a shred of deliberative process and participation. *Cf. Van Bourg*, 751 F.2d at 985; *State of Texas*, 889 F.2d at 61. The Bureau and the Klamath Tribes, in contrast, are not "past and potential adversaries" at this point—in many ways they have a relationship akin to that of attorney and client.

The majority ignores that the factor crucial to *County of Madison*'s holding was not that the Oneida had self-interest in mind in dealing with the Department of Justice, but that the documents in question were documents related to litigation in which the two were adversaries, rather than documents that the Department had requested to formulate policy, or assist in decision making. While the interests of the parties illuminate the function of the documents in *County of Madison, County of Madison* was decided on that function, not on the "selfishness" of the Oneida's motives.

As the First Circuit noted, "the line between supplicants and consultants may not always be clear." *County of Madison*, 641 F.2d at 1042. In this case, however, the Klamath Basin Tribes and Bureau relationship is consultative rather than self-seeking supplication. The relationship, as well as the documents here in question, are entirely different from those in *County of Madison*. These documents were not submitted in relation to litigation, but as part of a cooperative, consultative relationship mandated by Departmental policy and federal law.

Regardless of where the "conflict" is situated, or how we interpret prior case law, the crux of the majority's unease is that at some point the Department will have to balance the rights of the Tribes and those of the Association's members in allotting water in the KPOP. Thus, the majority perceives allowing these communications to be kept from disclosure under exemption five as, in some sense, allowing "ex parte" contact. In deciding this case on grounds prompted by that concern, however, the majority fails to recognize the implications of the relationship between the Department and the Tribes and the implications of its decision for that relationship.

This does not mean, as the majority argues, allowing the trust relationship would subvert FOIA and its goals. To the contrary, just as the fiduciary relationship between the Tribes and the government is not enough alone to justify blanket application of exemption five, *see Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 574 (9th Cir.1998) (trust relationship, while creating fiduciary duties, does not extend to give tribes greater rights than others under general regulations and statutes); *Skokomish Indian Tribe v. FERC*, 121 F.3d 1303, 1308 (9th Cir.1997), neither should the fiduciary relationship be a barrier to the application of the exemption— the end result of the majority's decision— if the exemption's requirements are otherwise fulfilled. The main thrust of the memos quoted by the majority is to improve communications between the tribes and the government as a part of strengthening their unique relationship. The spirit behind that policy is not carried out when we not only fail to recognize that relationship, but use it to frustrate the use of this otherwise applicable FOIA exemption. I argue not for giving extra favoritism to the Tribes under an equally applicable law, but for the recognition of the consequences of a true distinction between their position and the positions of others vis-a-vis the Department in this matter.

The Department and Bureau are mandated to bring claims for, and protect the interests of the Tribes in a way that they are not required to act for the Association's members, or other parties interested in the outcome of the KPOP. The Bureau is not only the agency principally entrusted with relations with Indian Tribes in general, but in this situation it is mandated to present claims on behalf of the Tribes in both the adjudication and the KPOP proceedings. The Tribes' relationship to the Bureau, and Department, is akin to an attorney-client or fiduciary relationship. Far from being in conflict with the Tribes, the Bureau in many ways functions as the Tribes' advocate.

Because the Tribes and Association are not similarly situated with regard to the Department, what is occurring is not "ex parte contact." Acknowledging this difference in relationships in our analysis of this

case would not mean granting the Tribes extra benefits under FOIA. FOIA does not require the release of these documents, as it might communications between the Association's members and the Department, because the Tribes have a formal consultative relationship and these documents are being used for predecisional, deliberative purposes. *See Van Bourg,* 751 F.2d at 985.

The majority's focus on "direct interest" rather than looking at the use, or function, of the documents is destructive in this context, where the Tribes and the Bureau are closely linked. This decision undermines the ability of the Bureau to fully understand and represent the Klamath Tribes in these two proceedings, without really adding much to the cause of freedom of information. There is no strong reason to chip away at that relationship in these circumstances.

It is important to remember that the Bureau, with whom all but one of these communications were exchanged, is not the final arbiter of water rights in either the KPOP or the Oregon adjudication. The Bureau is only one agency of many involved in the formulation of the KPOP and in that process its role concentrated on safeguarding the interests of the Tribes within the broader scheme of the KPOP. No position that the Bureau alone takes is likely to be taken as a given in the KPOP, and accepted without dispute by the other agencies in the Department.

In the end, the Bureau's and the Department's final policy position will become public—both in the KPOP proceedings and the adjudication. The Association and all others interested will find out that decision at an appropriate time, when there will be a chance to challenge and discuss. The majority's decision, allowing the Association to leap-frog that process, gains little in the public exposure of information and loses much in terms of the ability of the Bureau to carry out its duty to protect the rights of the Tribes. Because of this, and because I believe that the proper inquiry in this case should have been an inquiry

into the role the documents played in agency decision making, I dissent.