# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 5, 2007       Decided January 11, 2008

No. 06-5242

NATIONAL INSTITUTE OF MILITARY JUSTICE,
APPELLANT

v.

UNITED STATES DEPARTMENT OF DEFENSE,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 04cv00312)

———

*Rajesh De* argued the cause for the appellant. *Andrew J. Pincus* was on brief. *Mark H. Lynch* entered an appearance.

*Michael L. Waldman* was on brief for *amicus curiae* The Constitution Project in support of the appellant.

*Claire M. Whitaker*, Assistant United States Attorney, argued the cause for the appellee. *Jeffrey A. Taylor*, United States Attorney, *Michael J. Ryan*, Assistant United States Attorney, and *Karen L. Hecker*, Senior Attorney, and *Stewart F. Aly*, Attorney, United States Department of Defense, were on brief. *R. Craig Lawrence*, Assistant United States Attorney, entered an appearance.

Before: HENDERSON and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* TATEL.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The National Institute of Military Justice (NIMJ) filed this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, seeking, *inter alia*, nineteen records containing the opinions and recommendations of non-governmental lawyers whose advice the United States Department of Defense (DoD) solicited to promulgate regulations establishing terrorist trial commissions. The district court granted summary judgment in DoD's favor, concluding that the documents are exempt from disclosure under FOIA Exemption 5, *id*. § 552(b)(5). *See Nat'l Inst. of Military Justice v. U.S. Dep't of Defense*, 404 F. Supp. 2d 325, 342-47 (D.D.C. 2005). We agree that the documents are protected by FOIA Exemption 5 and therefore affirm the judgment of the district court.

**I.**

On November 13, 2001 President George W. Bush issued a Military Order to establish military commissions to try terrorists. *Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism*, 66 Fed. Reg. 57,833 (Nov. 16, 2001). The Military Order stated that any person subject to it—i.e., any non-citizen who the President determines there is reason to believe has been a member of al Qaeda, has engaged in acts of international terrorism against the United States or has knowingly harbored such persons—"shall, when tried, be tried by military commission for any and all offenses triable by military commission that such individual is alleged to have committed." *Id*. at 57,834. The Military Order further directed that the Secretary of Defense "shall issue such orders and regulations, including orders for the appointment of one or more

military commissions, as may be necessary to carry out" the trials. *Id.*[1]

---

[1]The Military Order further provided that the orders and regulations:

shall include, but not be limited to, rules for the conduct of the proceedings of military commissions, including pretrial, trial, and post-trial procedures, modes of proof, issuance of process, and qualifications of attorneys, which shall at a minimum provide for—

(1) military commissions to sit at any time and any place . . .;

(2) a full and fair trial, with the military commission sitting as the triers of both fact and law;

(3) admission of such evidence as would . . . have probative value to a reasonable person;

(4) in a manner consistent with the protection of information classified or classifiable under Executive Order 12958 of April 17, 1995, as amended, or any successor Executive Order, protected by statute or rule from unauthorized disclosure, or otherwise protected by law, (A) the handling of, admission into evidence of, and access to materials and information, and (B) the conduct, closure of, and access to proceedings;

(5) conduct of the prosecution by one or more attorneys designated by the Secretary of Defense and conduct of the defense by attorneys for the individual subject to this order;

(6) conviction only upon the concurrence of two-thirds of the members of the commission present at the time of the vote, a majority being present;

(7) sentencing only upon the concurrence of two-thirds of the members of the commission present

In the course of promulgating regulations,[2] DoD solicited and received comments from a number of non-governmental lawyers, who were former high ranking governmental officials or academics or both. According to DoD, it

> sought the opinions and recommendations of these outside consultants because their previous experience in the government and/or their expertise made them uniquely qualified to provide advice to the General Counsel's office on the Military Commissions procedures. Each was asked to provide their comments on the proposed Military Commission procedures.

Decl. of Christine S. Ricci, DoD Assoc. Dep. Gen. Counsel, (Ricci Decl.) 10 (Mar. 9, 2005). Although the consultants were "not paid for their services," there was "an understanding that they w[ould] consult and advise on a continuing basis." Decl. of Karen L. Hecker, Assoc. Dep. Gen. Counsel, Office of Gen. Counsel, DoD, (Hecker Decl.) 2 (July 18, 2005). There was also "an understanding that the contents of the consultations would not be released publicly." Decl. of Paul W. Cobb, Jr., former Dep. Gen. Counsel, Office of Gen. Counsel, DoD, (Cobb Decl.) 3 (Feb. 16, 2005).[3]

_____

at the time of the vote, a majority being present; and

    (8) submission of the record of the trial, including any conviction or sentence, for review and final decision by [the President] or by the Secretary of Defense if so designated by [the President] for that purpose.

66 Fed. Reg. at 57,834-85.

[2]The regulations issued in final form on July 1, 2003. *See* 68 Fed. Reg. 39,397 (July 1, 2003).

[3]The views of individuals who were "not consulted with on a

On October 3, 2003, NIMJ submitted a FOIA request to DoD seeking

> all written or electronic communications that the Department (including the Secretary and General Counsel) has either sent to or received from anyone (other than an officer or employee of the United States acting in the course of his or her official duties) regarding the President's November 13, 2001 Military Order, the Secretary's Military Commission Orders, and the Military Commission Instructions. This request includes but is not limited to suggestions or comments on potential, proposed, or actual terms of any of those Orders or Instructions and any similar, subsequent, superseding or related Orders or Instructions, whether proposed or adopted.

Compl. ¶ 5 (quoting FOIA Request Letter, Oct. 3, 2003); *see Nat'l Inst. of Military Justice*, 404 F. Supp. 2d at 330. In response, DoD released numerous documents but withheld others it considered exempt, including the nineteen documents NIMJ now seeks which DoD withheld as exempt under FOIA Exemption 5.

On February 26, 2004, NIMJ filed this action in the district court seeking the withheld documents. In an opinion and order filed December 16, 2005, the district court granted partial summary judgment in DoD's favor, concluding, inter alia, that the nineteen documents are exempt from disclosure, as claimed, under FOIA Exemption 5. *Nat'l Inst. of Military Justice*, 404 F. Supp. 2d at 342-47. In an opinion and order filed June 12, 2006,

---

continuing basis or with the understanding and expectation that their comments would be kept in confidence" were not withheld as exempt. Hecker Decl. 3-4.

the district court granted final summary judgment in DoD's favor and this appeal followed.

## II.

NIMJ appeals the district court's grant of summary judgment as to the nineteen documents the court held exempt under FOIA Exemption 5. Exemption 5 provides that FOIA "does not apply to matters that are . . . inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Relying heavily on the United States Supreme Court's decision in *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001), NIMJ asserts that Exemption 5 does not apply because the documents sought are not "inter-agency" or "intra-agency," as required by the statutory language.[4] We reject its challenge because our Circuit precedent interprets "intra-agency" to include agency records containing comments solicited from non-governmental parties such as the lawyers whose counsel DoD sought—and, more to the point, our precedent is not inconsistent with *Klamath*.

In *Ryan v. Department of Justice*, 617 F.2d 781 (D.C. Cir. 1980), we held that documents submitted by United States

---

[4]There is no dispute that the withheld documents satisfy the second requirement in Exemption 5—that they be "unavailable by law" under one of the established civil discovery privileges—here, under the "deliberative process" privilege. *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001). To qualify for Exemption 5 protection under the deliberative process privilege, "an agency's materials must be both 'predecisional' and a part of the 'deliberative process.'" *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1121 (D.C. Cir. 1989) (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151-52 (1975)). The withheld documents are plainly both.

senators in response to a questionnaire they received from the Department of Justice about procedures for selecting and recommending potential judicial nominees were exempt from FOIA disclosure under Exemption 5. We rejected the FOIA requesters' argument that, because the senators were "not agencies within the meaning of the FOIA," the withheld questionnaires "c[ould ]not be termed 'inter-agency' or 'intra-agency' " within the meaning of Exemption 5, reasoning:

> When interpreted in light of its purpose, . . . the language of Exemption 5 clearly embraces this situation. The exemption was created to protect the deliberative process of the government, by ensuring that persons in an advisory role would be able to express their opinions freely to agency decision-makers without fear of publicity. In the course of its day-to-day activities, an agency often needs to rely on the opinions and recommendations of temporary consultants, as well as its own employees. Such consultations are an integral part of its deliberative process; to conduct this process in public view would inhibit frank discussion of policy matters and likely impair the quality of decisions.

*Ryan*, 617 F.2d at 789-90 (citation footnote omitted). Noting that "efficient government operation requires open discussions among all government policy-makers and advisors, whether those giving advice are officially part of the agency or are solicited to give advice only for specific projects," we concluded: "When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of determining the applicability of Exemption 5." *Id.* at 790. Integral to the court's analysis was the fact that the documents sought "were generated by an initiative from the

8

Department of Justice, *i.e.*, the questionnaire sent out by the Department to the Senators." *Id.*[5]

In *Formaldehyde Institute v. Department of Health & Human Services*, 889 F.2d 1118 (D.C. Cir. 1989), we clarified that Exemption 5 extends to documents received from private, nongovernmental parties. In particular, we concluded the exemption protected documents containing comments of two private referees for the American Journal of Epidemiology on a report submitted for publication by a staff member of the Centers for Disease Control (CDC). Relying largely on *Ryan*, we found immaterial "the absence of any formal relationship" between the reviewers and the Department of Health and Human Services (HHS), 889 F.2d at 1123, explaining that " '[w]hether the author is a regular agency employee or a temporary consultant is irrelevant; the pertinent element is the role, if any, that the document plays in the process of agency deliberations,' " *id.* at 1122 (quoting *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1161-62 (D.C. Cir. 1987), *cert. denied*, 485 U.S. 977 (1988)).

More recently, in *Public Citizen, Inc. v. Department of Justice*, 111 F.3d 168 (D.C. Cir. 1997), we held exempt from disclosure records containing communications among former President Reagan, the National Archives and the Department of Justice and among former President Bush and the same agencies

---

[5]The court observed that "[t]he questionnaire plus replies must correspond in origin and process to literally *millions* of documents and memoranda of various kinds on a myriad of subjects which repose in the files of the executive departments and independent agencies, *i.e.*, memoranda which were created by someone outside the executive branch but in response to an initiative from the executive branch," noting that "[f]or example, the Department of Agriculture must have bales of information in response to questionnaires." *Ryan*, 617 F.2d at 790 & n.29.

regarding electronic records of each of the two Presidents' administrations. Acknowledging that "Public Citizen is doubtless right that a former President is not an agency under FOIA," we affirmed that "records of communications between an agency and outside consultants qualify as 'intra-agency' for purposes of Exemption 5 if they have been 'created for the purpose of aiding the *agency*'s deliberative process.' " *Pub. Citizen*, 111 F.3d at 170 (quoting *Dow Jones & Co. v. Dep't of Justice*, 917 F.2d 571, 575 (D.C. Cir. 1990) (emphasis by *Dow Jones* court)) (citing *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1161 (D.C. Cir. 1987)).

Taken together, the foregoing cases compel us to conclude that documents such as the ones here—submitted by non-agency parties in response to an agency's request for advice—are covered by Exemption 5. NIMJ attempts to distinguish those cases factually but to no avail. NIMJ first asserts, for example, that neither *Ryan* nor *Public Citizen* involved " 'ordinary private citizen[s],' " Opening Br. at 14 (quoting *Pub. Citizen*, 111 F.3d at 170)—but this argument overlooks the fact that *Formaldehyde Institute* did involve private citizens (two outside referees). NIMJ also contends that the "consultative relationship" here is not, as it was in *Public Citizen*, "mandated by statute," *id*.—but neither was it in either *Ryan* or *Formaldehyde Institute*.[6] *See Ryan*, 617 F.2d at 784

---

[6]NIMJ asserts, somewhat inaccurately, that "this Court in *Formaldehyde Institute* focused on the statutory mandate underlying the consultative process at issue." Opening Br. at 16-17. In that case, however, it was the decision, not the consultation, that was statutorily mandated. *See Formaldehyde Inst.*, 898 F.2d at 1124 ("Thus, *Congress* has directed HHS to make precisely the kind of 'deliberative' decision HHS made as a result of a process that involved HHS' receipt of the Review Letter." (emphasis in original)). In this case, an equally "deliberative" decision was mandated by the Military Order.

(questionnaires sent to senators in response to Executive Order No. 12097 directing U.S. Attorney General to assist in promulgating "standards and guidelines for the selection of nominees for United States district court judgeships," 43 Fed. Reg. 52,455, 52,455 (Nov. 13, 1978)); *Formaldehyde Inst.*, 889 F.2d at 1119 (reviewers commented in response to CDC employee's submission of article to private journal).

NIMJ next asserts that the cited Circuit precedents, even if otherwise controlling, have been "superseded" by the Supreme Court's decision in *Klamath*. Again we disagree.

In *Klamath*, the Court concluded that Exemption 5 does not protect documents submitted by Indian Tribes to the Department of the Interior, which documents addressed tribal interests that were then the subject of state and federal water allocation proceedings. In rejecting the Government's exemption claim, the Court focused on the language in Exemption 5 requiring that exempt documents be either "inter-agency or intra-agency," 532 U.S. at 9, and emphasized that there is "no textual justification for draining the first condition of independent vitality," *id*. at 12. Noting that the statute was silent "about communications with outsiders," the Court observed that "some Courts of Appeals have held that in some circumstances a document prepared outside the Government may nevertheless qualify as an 'intra-agency' memorandum under Exemption 5" under the so-called "consultant corollary" to Exemption 5. *Id*. at 9. "Typically," the Court added, "courts taking [this] view have held that the exemption extends to communications between Government agencies and outside consultants hired by them." *Id*. "In such cases," the Court noted, "the records submitted by outside consultants played essentially the same part in an agency's process of deliberation as documents prepared by agency personnel might have done," notwithstanding the consultants "were independent contractors and were not assumed to be subject to the degree of control that agency

employment could have entailed" and they were not necessarily "devoid of a definite point of view." *Id*. The Court concluded, however, that the Indian Tribes in *Klamath* were not analogous to government consultants.

The Court explained that "the fact about the consultant that is constant in the typical cases is that the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Id*. at 10-11. "Its only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do." *Id*. at 11. By contrast the Indian Tribes "necessarily communicate with the Bureau with their own, albeit entirely legitimate, interests in mind." *Id*. at 12. Although concluding that "this fact alone distinguishes tribal communications from the consultants' examples recognized by several Courts of Appeals," the Court further found that "the distinction is even sharper, in that the [Indian] Tribes are self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." *Id*. Finding the circuit cases on outside consultants thus distinguishable, the Court expressly declined to decide whether such consultants' reports "may qualify as intra-agency under Exemption 5." *Id*. at 12.

Given the Supreme Court's disclaimer and its reasoning, we perceive no basis to jettison our binding Circuit precedent. *See United States v. Carson*, 455 F.3d 336, 384 n.43 (D.C. Cir. 2006) ("[W]e are, of course, bound to follow circuit precedent absent contrary authority from an en banc court or the Supreme Court." (citing *Brewster v. Comm'r*, 607 F.2d 1369, 1373 (D.C. Cir. 1979))).[7] It remains true that " 'federal agencies

---

[7]The dissent contends we should leapfrog our precedent and construe afresh the statutory language, Dissent at 2—but we do not write on a clean slate. As we have recounted, in previous opinions this

occasionally will encounter problems outside their ken, and it clearly is preferable that they enlist the help of outside experts skilled at unravelling their knotty complexities.' " *Formaldehyde Inst.*, 889 F.2d at 1122 (quoting *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1162 (D.C. Cir. 1987)).  It was plainly preferable in this case for DoD to consult as widely as possible in order to fairly but effectively try terrorists in the aftermath of September 11, 2001.  Unlike the Indian tribes in *Klamath*, the individuals DoD consulted had no individual interests to promote in their submissions, as NIMJ itself concedes.  *See* Reply Br. at 4 n.1 ("The government is correct that NIMJ has made no suggestion of personal interest in these proceedings, nor does it intend to impugn the integrity of the distinguished individuals at issue."); *cf.* Cobb. Decl. 4 (stating that in addition to the "few written comments . . . received from individual lawyers who had been asked by the General Counsel to provide confidential legal views"—comments which NIMJ now seeks—"[m]any more comments came from members of the public or organizations *with an interest in these matters*, like Human Rights Watch or the American Bar Association"— "[s]ome of these comments were solicited; many were not"—comments for which DoD did not claim the Exemption)

---

Circuit has repeatedly interpreted Exemption 5 to extend to documents generated by non-agency individuals under our consultant corollary. To the extent they are not "effectively overrule[d]" by *Klamath*—and we do not believe that they are as we apply them—we are bound by their holdings. *See United States v. Williams*, 194 F.3d 100, 105 (D.C. Cir. 1999) (stating whether Supreme Court opinion supersedes Circuit precedent interpreting statute depends on whether opinion "effectively overrules, i.e., "eviscerate[s]" precedent and concluding: "That the Supreme Court had doubts about the constitutionality of [a] statute, doubts that it never had to resolve, is simply too thin a reed to permit a panel of this court to find similar doubts in a different statute and, based on those doubts, to depart from circuit precedent expressly interpreting the statute . . . .") (internal quotation omitted).

(emphasis added). For this reason, the case before us is readily distinguishable from *Klamath*, in which *"*the dispositive point [was] that the apparent object of the Tribe's communications is a decision by an agency of the Government to support a claim by the Tribe that is necessarily adverse to the interests of competitors." *Klamath*, 532 U.S. at 14. Further, although the individuals DoD consulted are, as NIMJ notes, private citizens rather than government employees or paid contract consultants, we see no reason why the absence of a contract or compensation should differentiate them from the "typical" outside agency consultants. These were not random citizens volunteering their opinions. DOD sought these individuals out and solicited their counsel based on their undisputed experience and qualifications. *See* Ricci Decl. 10-11).[8] Their contributions to DoD's deliberation in promulgating regulations were no less valuable or confidential for the lack of compensation or formal contract.

---

[8]They were an undisputedly distinguished group of individuals: a former DoD General Counsel, a former Secretary of the United States Department of Transportation, a former Legal Counsel to the President, a former Director of the Central Intelligence Agency and the Federal Bureau of Investigation, a former Secretary of the Army, a former Assistant Trial Counsel at the Nuremberg International War Trials, a former Special Counsel to the DoD General Counsel, a former Federal Communications Commission Chairman, a former Deputy Chief of the Fraud Section in the Department of Justice Criminal Division, a former DoD Deputy General Counsel, a former professor at the United States Naval War College and a member of the Secretary of State's Advisory Committee for International Law and the DoD Defense Policy Board, and a law professor and former Director of the American Law Institute. Second *Vaughn* Index of Docs. Withheld, filed in *NIMJ v. DoD*, No. 04-312 (D.D.C. Mar. 9, 2005).

Our established line of consultant cases is all the more compelling given that we have acknowledged the survival of our "consultant corollary" in the wake of *Klamath*. In *Judicial Watch, Inc. v. Department of Energy*, 412 F.3d 125 (D.C. Cir. 2005), two public interest organizations sought disclosure of documents held by eight federal agencies.[9] The documents had been prepared by the National Energy Policy Development Group (NEPDG), which was established by the President and composed of high ranking federal officials and employees detailed from federal agencies. We concluded that the withheld documents were protected under Exemption 5 notwithstanding NEPDG did not qualify as an "agency" under FOIA ("because its sole function [was] to advise and assist the President," 412 F.3d at 129) and it did not prepare the documents for an agency. We there acknowledged *Klamath*'s admonition that, to be protected by Exemption 5, a document must not only be pre-decisional and deliberative but "by the terms of Exemption 5, it must also be an 'inter-agency' or an 'intra-agency' record," 412 F.3d at 129 (citing *Klamath*, 532 U.S. at 9). We nonetheless found that "[o]ur interpretation of Exemption 5"—that documents held by agencies but prepared by the non-agency NEPDG come within Exemption 5's protection—"is not inconsistent with its textual limitation to 'intra-agency' or 'inter-agency' communications"; "[r]ather it follows from the principle, well established in this Circuit, that a document need not be created by an agency or remain in the possession of the agency in order to qualify as 'intra-agency.' " *Id.* at 130. To exemplify this principle, the court quoted *Ryan*'s dispositive determination: "When an agency record is submitted by outside consultants as part of the deliberative process, and it was

---

[9]The agencies were: the United States Departments of Agriculture, Commerce, Energy, the Interior, Transportation and the Treasury, the Environmental Protection Agency and the Federal Emergency Management Agency. *Judicial Watch*, 412 F.3d at 127.

solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of determining the applicability of Exemption 5." *Ryan*, 617 F.2d at 790, *quoted in Judicial Watch*, 412 F.3d at 130 (concluding that "[n]ot to treat in the same way documents shared with or received from the NEPDG, a body established by the President solely to advise him, and composed entirely of federal officials, would be anomalous indeed." (internal citation omitted)). We base our decision here on the same "well established" principle.

Notwithstanding this court has itself affirmed post-*Klamath* the continuing validity of the *Ryan* line of cases, NIMJ offers two particular arguments to support its view that *Klamath* supersedes Circuit precedent. We find neither one persuasive.

First, NIMJ contends that the *Klamath* Court's admonition to give "independent vitality" to the statutory terms "inter-agency" and "intra-agency" forecloses exempting documents an agency receives from private citizens as such records are neither inter- nor intra-agency. Contrary to NIMJ's contention, our continued adherence to the consultant corollary does not diminish the "independent vitality" of the statutory terms, as we made clear in *Judicial Watch*. In *Ryan* we explained that "[i]n the course of its day-to-day activities, an agency often needs to rely on the opinions and recommendations of temporary consultants, as well as its own employees," 617 F.2d at 789, and it is "entirely reasonable" to adopt a "common sense interpretation of 'intra-agency' " that encompasses the advice submitted by such temporary consultants. In this case, DoD itself solicited the advice contained in the documents from the individual nongovernmental lawyers for the agency's own use in promulgating terrorist trial commission regulations. Under such circumstances, it is consistent with *Ryan*'s "common sense" interpretation to deem the documents "intra-agency" so as to come within Exemption 5's protection. And it is likewise

consistent with *Klamath's* directive to hew to the language of the statute. Indeed, *Klamath* itself acknowledges that disinterested outside consultants "may be enough like the agency's own personnel to justify calling their communications intra-agency." 532 U.S. at 12.[10]

Second, NIMJ contends that *Klamath* expressly calls into question the holdings in *Ryan* and *Public Citizen*. It is true that the Court in *Klamath* stated that the two decisions "arguably extend beyond what we have characterized as the typical examples" of agency consultants but, consistent with its reasoning in the case before it, the Court expressed concern only with regard to the potential self-interests of the "consultants" involved in those cases. *See Klamath*, 532 U.S. at 12 n.4 (noting the former presidents in *Public Citizen* "had their own, independent interests" and in *Ryan*, the senators' questionnaire responses were held exempt "even though we would expect a Senator to have strong personal views on the matter"). As we have already noted, however, there is no dispute that the individuals DoD consulted were not pursuing interests of their own so as to run afoul of *Klamath*'s concern. Thus, the extent to which either *Ryan* or *Public Citizen may* have extended Exemption 5 beyond its permissible scope based on their peculiar facts is an issue we need not and do not decide here.

---

[10]The dissent seems to suggest that the people consulted must themselves be "within" the agency, *see* Dissent at 10, but the statute requires only that the withheld documents ("memorandums or letters") be "intra-agency." Consultants are in some sense necessarily "outside" rather than "inside" the agency but the documents they produce may nonetheless qualify as "intra-agency" documents. *See Klamath*, 532 U.S. at 10 (noting that in circuit consultant corollary decisions "the records submitted by *outside* consultants played essentially the same part in an agency's process of deliberation as documents prepared by agency personnel might have done") (emphasis added).

In applying the *Ryan* line of cases, we emphasize two factors in their analyses that support our continued application of the consultant corollary. First, as our cases make clear, the expectation that communications will remain confidential is crucial to eliciting candid and honest advice from outside consultants. *See Ryan*, 617 F.2d at 789-90 ("[C]onsultations [with temporary consultants] are an integral part of [an agency's] deliberative process; to conduct this process in public view would inhibit frank discussion of policy matters and likely impair the quality of decisions."); *Formaldehyde Inst.*, 889 F.2d at 1122 ("A predecisional document is a part of the '*deliberative process,*' if 'the disclosure of [the] materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.' " (quoting *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987))) (emphasis and alteration in *Formaldehyde Inst.*); *Pub. Citizen*, 111 F.3d at 170 ("[F]or a President to be able to give adequate assurances of confidentiality to his advisors, the assurances must last beyond his tenure."); *Judicial Watch*, 412 F.3d at 129 (Exemption 5's "inclusion in the statute 'reflect[s] the legislative judgment that the quality of administrative decision-making would be seriously undermined if agencies were forced to 'operate in a fishbowl' because the full and frank exchange of ideas on legal or policy matters would be impossible.' " (quoting *Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir.1997)) (alteration in *Judicial Watch*); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (" '(h)uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decisionmaking process' " (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974)) (alteration in *Sears*)); *see also* Hecker Decl. 3 ("The public disclosure of these materials would

discourage the frank, open discussions on these issues by these individuals.").

Second, throughout the *Ryan* line of cases, there have been some indicia of a consultant relationship between the outsider and the agency. Typically the relationship is evidenced by the fact that the agency seeks out the individual consultants and affirmatively solicits their advice in aid of agency business, as DoD did here. *See Ryan,* 617 F.2d at 790 ("When an agency record is submitted by outside consultants as part of the deliberative process, *and it was solicited by the agency*, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of determining the applicability of Exemption 5." (emphasis added)); *id.* ("We cannot overlook the fact that the documents here were generated by an initiative from the Department of Justice, *i.e.*, the questionnaire sent out by the Department to the Senators."); *Formaldehyde Inst.*, 889 F.2d at 1122 ("[I]t is unquestionably true that efficient government operation requires open discussions among all government policy-makers and advisors, whether those giving advice are officially part of the agency *or are solicited to give advice* only for specific projects." (emphasis added; internal quotation omitted)).[11] The dissent is therefore

---

[11]In *Formaldehyde Institute*, the court rejected the FOIA requester's contention that Exemption 5 did not apply because "the outside reviews were not 'solicited' by HHS," explaining:

[I]t is an undisputed fact that "receipt of comments [from outside reviewers] is an expected result in the submission of an article for publication." Furthermore, it is undisputed that reviewers' comments are "expected to be confidential." The agency does not "solicit" reviews in the sense that it contracts to receive them, but it does actively seek to do business with journals from which reviews are both expected and then used by CDC to determine whether and in what form to publish articles in the name of the agency. This arrangement reflects

wrong to suggest, *see* Dissent at 10-11, that our cases allow an agency merely to ask the general public for advice at a press conference or in the Federal Register and then to classify the resulting responses as "intra-agency" documents; nothing in our cases (including today's decision) even remotely supports the view that such circumstances would establish a consultant relationship between the agency and each individual. In addition, we do not see how the advice here would be any more "intra-agency," as the dissent suggests, were the individuals consulted classified as "committee" members or paid nominal stipends. *See* Dissent at 3, 10, 14-15. It was DoD's formal solicitation of their advice (with or without nominal pay or title) that created a consultant relationship and made them analogous to agency employees and documents containing their advice "intra-agency." We need not decide how Exemption 5 might apply to *any* agency solicitation for advice; this case involves the solicitation of advice from a discrete group of experts, not from "thousands of citizens." *See* Dissent at 11.

The dissent alleges that our reliance, in this case, on formal agency solicitation of advice from a discrete group of experts (consistent with Circuit precedent) presents a "fundamental problem" because these "principles . . . have no basis in Exemption 5's text." Dissent at 11. But the dissent itself offers no anchoring in the text for a bright-line rule requiring that an agency provide consultants with nominal payment or membership on a nominal committee if it wishes to consider documents containing their advice "intra-agency." Nor does it

---

a mutual understanding between the agency and journals that provide confidential reviews regarding how the agency will use the reviews. The existence of such an arrangement is more than enough to hold that the Review Letter is a part of the deliberative process of the agency.

889 F.2d at 1124 (record citations omitted) (alterations added).

explain how the text of Exemption 5 limits the volunteer consultants who can produce intra-agency documents to those on committees created under the Federal Advisory Committee Act (FACA), 5 U.S.C. App. 2 §§ 1-16 (nor, indeed, on the dissent's reading of *Klamath*, how it authorizes treatment of FACA-compliant consultants as "intra-agency"). Indeed, while the dissent is troubled by a belief that our analysis would *permit* advice to be solicited by e-mail from "every law professor in the country," Dissent at 11, and come within Exemption 5 (a scenario we expressly do not reach, see *supra* p. 19), the dissent's own analysis would seem to *require* us to extend Exemption 5 to such a case so long as the agency's e-mail invited "every law professor" to join an "Ad Hoc Committee for Advice on Legal Compliance" and indicated that a professor who provided responsive comments would thereby consent to membership on the Committee. There is nothing in the text of Exemption 5 that would require such; what matters is the nature of the relationship between the consultant and the agency, not the formalities observed.

For the foregoing reasons, we conclude that the nineteen documents NIMJ seeks are exempt from disclosure under FOIA Exemption 5. 5 U.S.C. § 552(b)(5). Accordingly, the judgment of the district court is affirmed.

*So ordered*.

TATEL, *Circuit Judge*, dissenting:  In November 2001, President Bush issued a military order authorizing the Department of Defense to create military commissions to try suspected terrorists.  DoD then sought advice about how to implement the order from legal luminaries outside the agency, including Bernard Meltzer, Lloyd Cutler, Ruth Wedgwood, Newton Minow, Terrence O'Donnell, William Coleman, Geoffrey Hazard, William Webster, Martin Hoffman, Jack Goldsmith, and Joseph Tompkins.  In response, these outside experts sent letters, faxes, or emails to DoD.  All were unpaid volunteers and none were appointed by DoD to any type of committee, task force, or other position, or made a part of DoD in any other way.  Nonetheless, the district court held— and now this court agrees—that these documents are "intra-agency memorandums or letters" protected from public disclosure under Exemption 5 of the Freedom of Information Act.  Despite the textual implausibility of this holding, I acknowledge that this court's precedent makes this a close case.  As a policy matter, moreover, I agree with my colleagues that agencies will obtain more and better advice from outsiders if able to promise confidentiality.  But I must respectfully dissent because I believe the court's holding does exactly what the Supreme Court forbade in *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001): it makes "'intra-agency' . . . a purely conclusory term, just a label to be placed on any document the Government would find it valuable to keep confidential."  *Id.* at 12.

## I.

The Freedom of Information Act (FOIA), 5 U.S.C. § 552, requires agencies to release all records upon public request unless they fall within an exemption enumerated in the Act. *Klamath*, 532 U.S. at 7.  These exemptions "must be narrowly construed," and "do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

DoD withheld the documents at issue here under FOIA Exemption 5, which protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "To qualify, a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it," such as the attorney-client, deliberative process, or attorney work product privileges. *Klamath*, 532 U.S. at 8. Because appellant National Institute of Military Justice concedes that these documents fall within the deliberative process privilege, the only question before us is whether they qualify as "intra-agency."

In answering this question, the court turns immediately to our precedent, but I begin with the statute's text. The prefix "intra" means "within." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1185 (1993); *accord* BLACK'S LAW DICTIONARY 841 (8th ed. 1999). Thus, "the most natural meaning of the phrase 'intra-agency memorandum' is a memorandum that is addressed both to and from employees of a single agency." *Klamath*, 532 U.S. at 9 (quoting *DOJ v. Julian*, 486 U.S. 1, 18 n.1 (1988) (Scalia, J., dissenting)). That said, several courts of appeals, including this one, "have held that [Exemption 5] extends to communications between Government agencies and outside consultants *hired* by them." *Id.* at 10 (emphasis added). For example, in *Hoover v. Department of Interior*, 611 F.2d 1132 (5th Cir. 1980), the Fifth Circuit held that Exemption 5 protected a memo prepared for the agency by a consultant it hired to appraise a piece of property it wanted to buy. Similarly, in *Government Land Bank v. General Services Administration*, 671 F.2d 663 (1st Cir. 1982), the First Circuit held that Exemption 5

protected a property appraisal prepared for the agency by an outside consultant.

Cases like these, which apply Exemption 5 to protect documents written by paid outside consultants, certainly stretch the meaning of "intra-agency," arguably disregarding the Supreme Court's directive that FOIA exemptions "must be narrowly construed." *Rose*, 425 U.S. at 361. But they still plausibly interpret "intra-agency": when an agency hires consultants to perform a task, it's not unreasonable to say they have become part of the agency for purposes of that project, making any documents they produce for the project "intra-agency." One could even imagine situations in which a document written by a volunteer could plausibly be considered "intra-agency"—for example, if a person were appointed to a formal advisory committee created by an agency pursuant to the Federal Advisory Committee Act (FACA), 5 U.S.C.App. 2 §§ 1-16, and in that capacity wrote a memorandum to an agency employee. *Cf. Soucie v. David*, 448 F.2d 1067, 1077-78 & n.44 (D.C. Cir. 1971) (stating in dicta that a report prepared by outside experts formally appointed to a federal advisory panel might be protected under Exemption 5).

In this case, however, the government asks us to stretch Exemption 5 beyond its breaking point, to cover *everyone* an agency asks for advice. The government's argument flatly ignores the statute's text, as well as our obligation to construe FOIA exemptions narrowly. Nonetheless, the government insists that our precedent requires the result it seeks, and this court now agrees, relying principally upon three cases from this circuit. Below I describe these cases and then explain why I believe *Klamath* undermines all of them.

The first case, *Ryan v. DOJ*, 617 F.2d 781 (D.C. Cir. 1980), involved questionnaires the Attorney General sent to members of the Senate asking how they chose whom to recommend for district court judgeships. *Id.* at 784. Responding to a FOIA request seeking the senators' responses, the Attorney General argued that the questionnaires were "intra-agency" documents protected by Exemption 5. This court agreed, explaining:

> Congress apparently did not intend "inter-agency" and "intra-agency" to be rigidly exclusive terms, *but rather to include any agency document that is part of the deliberative process.* We cannot overlook the fact that the documents here were generated by an initiative from the Department of Justice, i.e., the questionnaire sent out by the Department to the Senators. The Senators replied to the questionnaire. . . . When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an "intra-agency" memorandum for purposes of . . . Exemption 5.

*Id.* at 790 (emphasis added) (footnotes omitted).

In the second case, *Formaldehyde Institute v. Department of Health & Human Services*, 889 F.2d 1118 (D.C. Cir. 1989), an HHS scientist submitted an article for publication in a peer-reviewed journal. After the journal gave the article to outside reviewers who recommended against publishing it, the journal sent a rejection letter, along with the comments of its

reviewers, to the scientist and HHS. We held the comments protected under Exemption 5:

> The Institute argues, and the District Court concluded, that because the Journal is neither part of HHS nor one of HHS'[s] consultants, the Review Letter is not entitled to Exemption 5 protections. . . .
>
> . . . .
>
> . . . *Ryan* established, [however,] . . . that "inter-agency" and "intra-agency" are not rigidly exclusive terms, *but rather embrace any agency document that is part of the deliberative process*. Thus, both the Institute and the District Court err in focusing on the absence of any formal relationship between the Journal's reviewers and HHS.

*Id.* at 1123 (emphasis added) (citations and internal quotation marks omitted).

In the third case, *Public Citizen, Inc. v. DOJ*, 111 F.3d 168 (D.C. Cir. 1997), Public Citizen sought disclosure of letters sent by former Presidents Reagan and Bush to the National Archives and Records Administration regarding access to their presidential papers. We held the letters protected under Exemption 5:

> While Public Citizen is doubtless right that a former President is not an agency under FOIA, *records of communications between an agency and outside consultants qualify as "intra-agency" for purposes of Exemption 5 if they have been created for the purpose of aiding the agency's deliberative process*. It is

irrelevant whether the author of the documents is a regular agency employee or a temporary consultant. Two circumstances make application of this doctrine to the disputed records peculiarly appropriate.

First, the former President in this context can hardly be viewed as an ordinary private citizen. He retains aspects of his former role— most importantly, for current purposes, the authority to assert the executive privilege regarding Presidential communications. . . .

. . . .

Second, the consultative relationship involved here is not only explicit, but is mandated by statute. The Presidential Records Act establishes an elaborate structure for the management of Presidential records. The United States retains ownership, possession and control. But the President plays a significant role even after he leaves office.

*Id.* at 170-71 (emphasis added) (citations and internal quotation marks omitted).

As an initial matter, *Public Citizen* and *Ryan* are distinguishable from this case. In *Public Citizen* we relied heavily on two facts not present here: former Presidents are still part of the government in many ways, and a statute expressly required the National Archives and Records Administration to consult with them. Both facts made it more plausible than it is here to call the documents at issue "intra-agency." And in *Ryan* the "outsiders" offering comments were U.S. senators, making it more reasonable to consider their comments "inter-agency or intra-agency."

That said, were *Public Citizen*, *Ryan*, and *Formaldehyde* the only cases on point, we would undoubtedly have to rule for DoD based on the broad principles we announced in these cases. All three cases say it makes no difference whether the documents at issue were generated by someone within the agency. All that matters, they hold, is that the documents played a role in the agency's deliberative process, a standard indisputably met here.

The problem with these cases, however, is that in *Klamath* the Supreme Court rejected exactly this type of reasoning. In *Klamath*, Indian tribes were communicating with the Department of Interior about their interests during upcoming federal and state water allocation decisions. The government argued that its communications with the tribes enjoyed Exemption 5 protection because confidential communications with the tribes were crucial to the agency's deliberative process. Flatly rejecting this argument, the Supreme Court explained: "the first condition of Exemption 5 is no less important than the second; *the communication must be 'inter-agency or intra-agency.'*" 532 U.S. at 9 (quoting 5 U.S.C. § 552(b)(5)) (emphasis added). The Court thus chided the government for making a fundamental error:

> [T]he Department's argument skips a necessary step, for it ignores the first condition of Exemption 5. . . . The Department seems to be saying that "intra-agency" is a purely conclusory term, just a label to be placed on any document the Government would find it valuable to keep confidential.
>
> *There is, however, no textual justification for draining the first condition of independent*

*vitality . . . .*

*Id.* at 12 (emphasis added).

The Court then went on to decide *Klamath* on a narrow ground. While acknowledging that some courts of appeals had "held that [Exemption 5] extends to communications between Government agencies and outside consultants *hired* by them," *id.* at 10 (emphasis added), the Court expressly declined to decide whether consultants' reports generally "may qualify as intra-agency under Exemption 5," *id.* at 12. Instead, it held that even if some communications from paid consultants could qualify for Exemption 5 protection, communications from the tribes in *Klamath* could not because unlike the typical consultant, who "does not represent an interest of its own . . . when it advises the agency that hires it," *id.* at 11, the tribes, in their communications with the Department of Interior, were representing their own interests, *id.* at 14.

*Klamath* thus presents us with a dilemma. While leaving open the possibility that some communications from consultants may qualify for Exemption 5 protection, the decision also makes clear that "the first condition of Exemption 5 is no less important than the second; *the communication must be 'inter-agency or intra-agency.'*" *Id.* at 9 (quoting 5 U.S.C. § 552(b)(5)) (emphasis added). *Klamath* also warns that "[t]here is . . . no textual justification for draining the first condition of independent vitality." *Id.* at 12. Thus, our earlier cases protecting communications from outside consultants under Exemption 5 remain good law only to the extent they give "independent vitality" to the meaning of "intra-agency."

In my view, none of the cases the court relies on passes this test. In *Ryan*, the court held, in language this court never mentions: "Congress apparently did not intend 'inter-agency' and 'intra-agency' to be rigidly exclusive terms, *but rather to include any agency document that is part of the deliberative process*." 617 F.2d at 790 (emphasis added). *Formaldehyde* holds exactly the same thing: "'Inter-agency' and 'intra-agency' are not rigidly exclusive terms, *but rather embrace any agency document that is part of the deliberative process*." 889 F.2d at 1123 (citing *Ryan*, 617 F.2d at 790) (emphasis added); *see also Dow Jones & Co. v. DOJ*, 917 F.2d 571, 575 (D.C. Cir. 1990) ("*Ryan* (and *Formaldehyde*), then, stand for the proposition that Exemption 5 permits an agency to protect the confidentiality of communications from outside the agency so long as those communications are part and parcel of *the agency's* deliberative process."). And *Public Citizen* holds that "records of communications between an agency and outside consultants qualify as 'intra-agency' for purposes of Exemption 5 if they have been 'created for the purpose of aiding the *agency's* deliberative process.'" 111 F.3d at 170 (quoting *Dow Jones*, 917 F.2d at 575). All three cases thus define "intra-agency" documents as those that play a role in the agency's deliberative process, regardless of their source. Yet such reasoning is precisely what *Klamath* rejects: the "argument skips a necessary step, for it ignores the first condition of Exemption 5" and makes "'intra-agency' . . . a purely conclusory term." 532 U.S. at 12.

Despite this crucial language from *Klamath*, the court holds that our earlier cases "compel us to conclude that documents such as the ones here—submitted by non-agency parties in response to an agency's request for advice—are covered by Exemption 5." Majority Op. at 9. The court derives this test from *Ryan*'s statement that "[w]hen an agency record is submitted by outside consultants as part of

the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of . . . Exemption 5." 617 F.2d at 790. According to the court, this test from *Ryan* survives *Klamath* because it somehow gives "independent vitality" to "intra-agency." I would agree if the court read this passage from *Ryan*—and limited its holding here—to mean that Exemption 5 protects documents agencies solicit from people who could plausibly be called "intra-agency," such as paid consultants or members of official agency committees created under FACA. The problem, however, is that the court holds that a document qualifies as "intra-agency" if an agency solicits it from *anyone*.

Rather than giving "independent vitality" to "intra-agency," this test redefines that term. "Intra" means "within," and "[i]n the absence of an indication to the contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993)). In enacting FOIA, Congress gave no indication that it intended a previously unheard of definition of "intra," so we are bound by the normal meaning of the term. *See United States v. Weber Aircraft Corp.*, 465 U.S. 792, 802 (1984) (stating that "compelling evidence of congressional intent . . . would be necessary to persuade us to look beyond the plain statutory language" of Exemption 5).

The court nonetheless holds that "documents . . . submitted by non-agency parties in response to an agency's request for advice" are "intra-agency," Majority Op. at 9, effectively declaring that people come "within" an agency once the agency asks for their opinions. In my view, this does not represent a "common sense interpretation of 'intra-

agency.'" *Id.* at 15 (quoting *Ryan*, 617 F.2d at 790). Indeed, under the court's rule, if an agency held a press conference and asked citizens to send in advice, letters from everyone who responded would qualify as "intra-agency." Seeking to escape this untenable result, the court adds a new requirement: the solicitation must be "formal." *Id.* at 19. Requiring formality, however, does nothing to prevent absurd results. For example, an agency request for advice published in the Federal Register would be "formal," but hardly enough to make letters sent by members of the public who responded "intra-agency." Perhaps by "formal" the court means individualized, but if an agency sent personalized letters to thousands of citizens asking for advice, no one could plausibly call their responses "intra-agency." The court next suggests that a solicitation suffices if addressed to a "discrete group of experts." *Id.* But a DoD request for advice to every law professor in the country would qualify as a request to a "discrete group of experts," yet the professors' responses plainly would not be "intra-agency." Apparently unable to distinguish away this ridiculous consequence of its rule, the court instead attacks my reading of the statute as lacking any basis in Exemption 5's text and leading to equally absurd results. *Id.* The court is incorrect on both counts.

My discussion of the plausible outer limits of Exemption 5—as possibly including some paid consultants and unpaid members of official agency committees—flows directly from the statute's text: it rests on the "ordinary, contemporary, common meaning" of "intra-agency." *Pioneer*, 507 U.S. at 388. That is, as I explained above, one can plausibly say that some paid consultants and members of official agency committees have come "within" the agency. By contrast, the principles the court develops in response to the troubling examples in the previous paragraph have no basis in Exemption 5's text. An agency's mere request for advice, no

matter how formal or selective, has nothing to do with whether a person's response comes from within or outside the agency. Without some indicia that the person responding is "within" the agency, such as a paid consulting contract, "intra-agency" has no meaning. Moreover, contrary to the court's claim, nothing I have said even suggests a "bright-line rule" that any person who receives "nominal payment" or is a member of a "nominal committee" qualifies as "intra-agency." Majority Op. at 19. I have said only that *at least some* paid consultants and members of formally created agency committees could plausibly qualify as "intra-agency." If, as the court hypothesizes, an agency called law professors "committee members" merely because it asked for their advice once, *id.* at 20, they would not qualify as "intra-agency." This ruse would fail not only because it would amount to a transparent attempt to game Exemption 5, but also because there would be no meaningful indicators that the professors had actually come within the agency, such as might exist for members of official agency committees that meet and consult regularly with agency officials. Making matters even worse, such a "committee" would violate FACA in several ways, including that it would have been created neither by statute nor agency order published in the Federal Register. 5 U.S.C.App. 2 § 9(a). In the end, however, I need not address every such hypothetical, for regardless of where we ultimately establish the outer boundaries of "intra-agency," *here* it is crystal clear that the experts who submitted comments do not qualify.

Of course, I understand the court's desire to interpret Exemption 5 to accomplish what it perceives to be that exemption's goal, but we may not use statutory purpose to produce an unreasonable interpretation. *See Freeman v. B & B Assocs.*, 790 F.2d 145, 149 (D.C. Cir. 1986) ("[W]e will not ignore the words of the statute in pursuit of some disembodied

congressional purpose."). "[T]hat Congress might have acted with greater clarity or foresight" by protecting some communications from outside volunteers "does not give [this] court[] a *carte blanche* to redraft [the] statute[] in an effort to achieve that which Congress is perceived to have failed to do." *United States v. Locke*, 471 U.S. 84, 95 (1985).

In any event, looking to FOIA's purpose gives no clear answer to the question before us. Congress certainly intended Exemption 5 to ensure that agencies not "operate in a fishbowl," H.R. REP. NO. 89-1497, at 10 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 2418, 2427, but it also "attempted to delimit the exception as narrowly as consistent with efficient Government operation," S. REP. NO. 89-813, at 9 (1965), suggesting that Congress never intended courts to expand the exemption beyond its terms. What's more, "disclosure, not secrecy, is the dominant objective of [FOIA]." *Rose*, 425 U.S. at 361. Because FOIA thus embodies conflicting purposes, we must presume that Congress used language it believed properly reconciled these goals. "[D]eference to the supremacy of the Legislature, as well as recognition that [members of Congress] typically vote on the language of a bill, generally requires us to assume that 'the legislative purpose is expressed by the ordinary meaning of the words used.'" *Locke*, 471 U.S. at 95 (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)).

Finally, and crucially, the court's definition of "intra-agency" disregards the Supreme Court's command that FOIA exemptions "be narrowly construed," *Rose*, 425 U.S. at 361, and "read strictly in order to serve FOIA's mandate of broad disclosure," *Klamath*, 532 U.S. at 16. Whatever the policy merits of the court's interpretation of "intra-agency," it is far from narrow or strict.

Despite these problems with its approach, the court maintains that our precedent demands its result. It offers a number of reasons for this conclusion, each of which I think flawed.

To begin with, the court finds "no basis to jettison our binding circuit precedent," Majority Op. at 11, because *Klamath* never determined whether consultants' reports "may qualify as intra-agency under Exemption 5," 532 U.S. at 12. But *Klamath* did decide that courts may not "ignore the first condition of Exemption 5" and make "'intra-agency' . . . a purely conclusory term," *id.*—precisely what this court did in *Ryan*, *Formaldehyde*, and *Public Citizen*. Thus, the test set forth in *United States v. Williams*, 194 F.3d 100 (D.C. Cir. 1999), upon which the court relies, Majority Op. at 12 n.7, is met here because *Klamath* "eviscerates" the reasoning in the *Ryan* line of cases. *Williams*, 194 F.3d at 105. Indeed, *Klamath* so clearly undermines *Formaldehyde* that even under the expansive definition of "intra-agency" the court adopts today, *Formaldehyde* would have come out the opposite way, for there the agency did not solicit the documents it sought to protect—rather, an outside journal solicited the comments and later gave them to the agency. This highlights just how much *Klamath* has already "jettison[ed] our binding circuit precedent." *See In re Sealed Case*, 352 F.3d 409, 412 (D.C. Cir. 2003) ("[A] three-judge panel may always . . . determine . . . that a prior holding has been superseded, and hence is no longer valid as precedent." (citations and internal quotation marks omitted)).

Next, the court insists it is irrelevant that the individuals who offered advice to DoD were "private citizens rather than government employees or paid contract consultants," saying "we see no reason why the absence of a contract or compensation should differentiate them from the 'typical'

outside agency consultants." Majority Op. at 13. But the lack of a contract or compensation matters. For one thing, contracting with and paying a consultant establishes a formal relationship between that person and the agency, making it at least plausible to consider the person "intra-agency." In contrast, the court allows agencies to describe anyone they ask for advice as "consultants," never explaining how private citizens can reasonably be described as "intra-agency" merely because an agency asks for their views. Moreover, although the court seeks support for its holding in *Klamath*'s statement that outside consultants "may be enough like the agency's own personnel to justify calling their communications 'intra-agency,'" Majority Op. at 16 (quoting *Klamath*, 532 U.S. at 12), it ignores that *Klamath* was referring to "communications between Government agencies and outside consultants *hired* by them." 532 U.S. at 10 (emphasis added); *see also id.* ("[T]he consultants in these cases were independent contractors . . . .").

Lastly, the court believes that our post-*Klamath* decision in *Judicial Watch, Inc. v. Department of Energy*, 412 F.3d 125 (D.C. Cir. 2005), reaffirms *Ryan*, *Formaldehyde*, and *Public Citizen*. But this reading overstates our holding in *Judicial Watch*. There we held that although the National Energy Policy Development Group (NEPDG)—a body composed entirely of federal employees from many agencies who advised the president on energy policy—was not an agency within the meaning of FOIA, Exemption 5 still protected documents created or received by the group as part of its deliberative process. Our rationale, however, was not that it was irrelevant whether the documents were "intra-agency." Instead, we held that because the federal employees who made up the NEPDG were advising the President, they were, in effect, part of the President's staff, and their documents were therefore protected under earlier decisions

holding that documents prepared by presidential staff enjoy Exemption 5 protection. *See id.* at 129 ("Neither Exemption 5 nor the cases interpreting it distinguish between the decision-making activities of an 'agency' subject to the FOIA and those of the President and his staff . . . .").

To be sure, after reaching this conclusion we went on to note, in language the court cites, that our holding was "not inconsistent with [Exemption 5's] textual limitation to 'intra-agency' or 'inter-agency' communications," because in *Ryan* and other cases we had established "that a document need not be created by an agency or remain in the possession of the agency in order to qualify as 'intra-agency.'" *Id.* at 130. As an example of this principle, we pointed to *Ryan*'s statement quoted above: "When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of . . . Exemption 5." *Id.* (quoting *Ryan*, 617 F.2d at 790). In citing this passage from *Ryan*, however, we could not possibly have been *holding* that documents solicited from outside volunteers qualify as "intra-agency," for no such documents were at issue in *Judicial Watch*. All we actually held is something undisputed here: that at least some documents created by people other than agency employees may qualify as "intra-agency." Moreover, as explained above, reading this statement to apply to documents solicited from *anyone* fails to account for *Klamath*; it redefines "intra-agency" rather than giving the term "independent vitality."

## II.

Whether agencies should be able to withhold communications they solicit from outside volunteers is a difficult policy question about which reasonable people

disagree. The National Institute of Military Justice argues that allowing agencies to withhold such communications will allow "secret participation by members of the public in critical agency rule-making processes." Appellant's Opening Br. 21. The government and this court respond that allowing agencies to promise confidentiality will encourage candid advice from outside advisors and thus improve agency decisionmaking.

As a policy matter, I agree with my colleagues. Agencies will obtain better advice if they can promise confidentiality to outside volunteers whose views they solicit, and I think the benefits of such advice will outweigh the cost in lost transparency. But my view on this issue is not the one that matters. The proper way to resolve this policy issue is not for this court to stretch Exemption 5's words to cover whatever it thinks they should, but rather for Congress to hold hearings, determine whether it wishes to protect communications from outside volunteers, and modify Exemption 5's language accordingly.

We find ourselves in a situation similar to that we faced in *Dow Jones & Co. v. DOJ*, 917 F.2d 571 (D.C. Cir. 1990). There we said: "It may well be true that if Congress had thought about this question, the Exemption would have been drafted more broadly to include [communications like this one]. But Congress did not, and the words simply will not stretch to cover this situation . . . ." *Id.* at 574. Because Exemption 5's words "simply will not stretch to cover this situation," *id.*, and because the result the court reaches contravenes *Klamath*, I would reverse the district court and direct DoD to make these documents public.